The Commonwealth on the relation of GRIFFITH
*against*
COCHRAN, Secretary of the Land Office.

*Lancaster,
Saturday,
May 30.*

AT the last term of this Court for the *Lancaster* district, a rule was granted upon the defendant to shew cause on *Monday* the 27th of *May*, why a *mandamus* should not be issued, " commanding him to prepare and deliver patents to *Robert E. Griffith*, who survived *Philip Nicklin*, (which said *Robert* and *Philip*, in the life time of the said *Philip*, were assignees of *Joseph Boone*, who was assignee of *John Nicholson*) for sixty-eight tracts of land, situate in what was formerly called the Eighteen Districts, and which were surveyed on sixty-seven warrants of one thousand acres each, and one warrant for four hundred acres, dated the 19th of *March* 1805;—the purchase money for which warrants

Where a ministerial act is to be done, and there is no other specific remedy, a *mandamus* act required; but where the complaint is against a person who acts in a judicial or deliberative capacity, he may be ordered by *mandamus* to proceed to do his duty, by deciding and acting according to the best of his judgment, but the court will not direct him in what manner to decide.

Hence a *mandamus* will lie to the secretary of the land office, to compel him to make the calculations of purchase money and interest on lands sold, if he has omitted or wholly refused to do it; but it will not lie to command him in what manner to make the said calculations, that act not being merely ministerial; nor, if he has already, under the direction of the board of property, made the calculations in an erroneous manner, will it lie to compel him to make them in a proper manner.

was paid at the time they issued, and the surveys made thereon, returned into the surveyor general's office on the 3d of *February* and the 16th of *March* 1808, and accepted; the said warrants being issued on the application of the said *John Nicholson*, and in pursuance of two decisions of the board of property, one dated the 14th of *January* 1804, and the other the 25th of *January* 1805;—on the said *Robert E. Griffith*, paying into the treasury of the commonwealth, the purchase money due for the surplus quantity of land contained in the surveys made on said warrants, with interest upon the same, from the time of the surveys being made, respectively, until the 5th of *November* 1810, when a sum of 1800 dollars in specie, equal to the payment of the whole thereof, and the fees of patenting the said tracts, was tendered to him, with an offer immediately to pay the whole purchase money, and interest as aforesaid due, with the said patenting fees, into the treasury, for the purpose of obtaining patents for the said tracts, upon being furnished by the said secretary, with the requisite certificates to the treasurer for that purpose, which the said secretary refused."

To this rule the secretary returned on the 27th of *May*, in substance as follows:—" That he has no cause to shew, excepting that the said *Robert E. Griffith* has not paid a balance of purchase money, interest and fees due on the lands, which the act abolishing the offices of receiver-general and master of the rolls, requires to be done, before patents can lawfully issue. The said secretary has always been ready, and now is ready, to perform every act and thing on his part, towards preparing and delivering said patents, any representation or false statement made to the honourable court to the contrary notwithstanding. Had the secretary been required to shew cause why calculations were not made agreeably to the directions of Mr. *Griffith's* agent, several good reasons might have been furnished; but as the making of calculations, or causing them to be made, is exclusively the duty of the said secretary, he claims the right of making them, subject to the control of the board of property, who have in the case of *Nicklin* and *Griffith's* warrants directed him how to proceed. And if the secretary has refused to make calculations agreeably to the wishes of said agent, being so instructed by the board, under whose con-

1812.

GRIFFITH
v.
COCHRAN.

trol he is, the refusal, of course, was a refusal of the board, and not of the secretary of the land office; and although he, as well as the other members of the board, are ever ready to respect the decisions of the court, and in a certain degree consider themselves bound thereby, yet when duties are pointed out by express and written acts of the legislature, the said secretary considers himself bound to adhere to them &c."

On the 30th of *May* 1811, a second rule was granted on the secretary, to shew cause on *Saturday* the first of *June*, why a *mandamus* should not be issued, pursuing the terms of the first rule, with the following variations, viz. " commanding him to prepare and deliver *the usual certificates and calculations of the purchase money and interest* due for the surplus quantity of land contained in the surveys made upon sixty-eight tracts of land, together with the patent fees for the said tracts, *towards enabling him to obtain patents for the same on the payment thereof;"*—further alleging, that " *regular certificates for the purpose of patenting, had been issued by the surveyor-general on the said surveys respectively, and deposited on and previously to the 5th of November last, with the said secretary;"*—then stating the tender of the money as before, and concluding " *which certificates and calculations then were demanded of the said secretary, and refused by him."*

To this rule the secretary returned on the 1st of *June*, as follows:—" On the 30th of *May*, a notice was served on the secretary of the land office, to shew cause this day why a *mandamus* should not be issued &c.; wherein it is stated that the usual certificates and calculations of purchase money &c. for sixty-eight tracts of land &c. were demanded of the said secretary, and refused by him."

" The said secretary says, that on the sixth of *November*, 1810, sixty-one calculations had been made on so many of said tracts, and the usual certificates made out therefor, and severally signed by the said secretary, and no objections made as to delivering the same, which the said secretary stands prepared to prove."

" Seven of the said sixty-eight tracts, however, at that time, could not be acted upon, because they contained a

VOL. V.                    M

1812.

GRIFFITH
<span style="text-align:center">∴.</span>
COCHRAN.

greater surplus than by law could be received. But that difficulty is now removed by an act passed last session."

This return, not meeting the real point in controversy, viz. the dispute respecting the time from which the interest was to be calculated, a *mandamus* was awarded on the 1st of *June* 1811, returnable the third *Monday* of *May* 1812, to shew cause, &c.

To this *mandamus* the following return was made.

" Whereas a *mandamus* was awarded by the said court, against the secretary of the land office on the 1st of *June* 1811, commanding him to shew cause on the third *Monday* of *May* 1812, why he had not conformed to, and complied with a rule, granted the 30th of *May* 1811, which rule required him to shew cause, why he did not prepare and deliver to *Robert E. Griffith*, the usual certificates and calculations for sixty-eight tracts of land &c."

" The said secretary, with all due deference to the honourable court, in return to said writ answers, that he thought he had superseded the necessity of issuing the said rule, by having answered to a previous rule in the same case, wherein he had stated, that he had never refused, but was ready and willing at all times to do and perform every act on his part, towards preparing and delivering patents for said tracts, (preparing of which certificates was a part of his duty towards the issuing of patents,) as soon as said *Griffith* had paid the respective fees and balances due the state. The said secretary also thought he had superseded the necessity of issuing the said writ, by having in his return to said last rule, stated, that calculations had been made out for sixty-one of said tracts, with certificates to the treasurer for the same, which had been severally signed, and ready for delivery when called for; and that the difficulty respecting seven others had been removed by an act of the legislature. The said secretary therefore, thought the honourable court would not have commanded him to do, what he had not only not refused to do, but had actually done and performed; which will appear by the annexed *affidavit*."

" There is no person more ready than the said secretary, to obey the constituted authorities of government; but the present case being an irregularity, touching an imperfect

title, the said secretary (as at present advised) thinks the exclusive power of deciding thereon, is vested in the board of property, and consequently any thing touching the same, is not within the jurisdiction of the honourable court. It is a case between the commonwealth and an individual, wherein the treasury is interested several thousand dollars; and the said secretary considers it taking by indirect means, the commonwealth into court, without the consent of her immediate representatives, which the said secretary believes cannot constitutionally be done. By the sixth section of the fifth article of the constitution, the legislature are authorised to distribute the judicial powers as they shall judge proper. And by an act passed the 5th of *April* 1782, the board of property are constituted a court ' to hear and determine in all cases of controversy on *caveats*, in all matters of difficulty, or irregularity, &c. touching imperfect titles, or otherwise &c.,' and these powers are by subsequent laws (since the adoption of the present constitution) transferred to the existing board."

" This, then, being clearly an irregularity, touching an imperfect title, the power would appear to be clearly given to the board to decide thereon. It cannot be said, this comes under the provisions of the third section of said law, which authorises either party to enter his suit at common law, after a decision."

" By another act, passed the 29th of *March* 1809, it is made the exclusive duty of the secretary of the land office, to make, or cause to be made, all calculations &c.; and by another act passed the 21st of *March* 1806, it is declared, ' that in all cases where a remedy is provided, or duty enjoined, or any thing directed to be done, by any act or acts of assembly of this commonwealth, the directions of the said acts shall be strictly pursued &c. The board, with full powers, have corrected the irregularity in the present case, and directed the manner that the calculations shall be made; and the secretary of the land office has caused the same to be made accordingly. The honourable court will not then, he presumes, command the said secretary to disrespect the directions of the board, and direct him to make calculations in a different manner, and thereby prejudice the state, by preventing a large sum of money from going into the trea-

1812.

GRIFFITH
*v.*
COCHRAN.

1812.

GRIFFITH
v.
COCHRAN.

sury. If the said secretary were to disobey the directions of the board, in a case where they had decided on an imperfect title, he would consider himself guilty of a misdemeanor in office, and consequently liable to impeachment by the third section of the fourth article of the constitution. He cannot therefore knowingly be guilty of a breach of his *official duty.*"

The affidavit referred to in this return, sworn to before president *Franklin*, by the deputy secretary of the land office, stated the facts of presenting the tickets, and requesting the calculations and certificates to the state treasurer for the 68 tracts, in *November* 1810. That calculations were made on sixty-one of the tickets &c. as directed by the secretary of the land office, and the usual certificates made out, dated the 6th of *November* 1810, and signed by the secretary, &c. That three or four days afterwards, the agent came to the office, and enquired if calculations on the tickets left by him, had been made; which was answered in the affirmative, and the certificates offered to him. That he enquired on what terms the calculations were made, and was answered by deponent, that they were made agreeably to the terms directed by a minute of the board of property, a copy of which he shewed to the agent, who read it, and said, that as they were in conformity to that decision of the board, he would not take the certificates, as he did not intend to pay the amount therein stated to be due. That the said certificates have ever since remained in the office, and would at any time have been delivered to the agent, had he demanded them.

The minutes of the board of property, at different times, material to this case, are as follow:—*January* 14th, 1804. The board resumed the consideration of the application of *Joseph Boone*, assignee of *John Nicholson*, to have warrants granted him on the application of *John Nicholson*, made the 21st of *April* 1794, for two hundred and six warrants, containing 202,400 acres, in the Eighteen Districts, when the following facts appeared.

That on the said 21st day of *April*, the said *John Nichol-*

*son* made a regular application for the said two hundred and six warrants, which was entered, and the said *Nicholson* then gave the then receiver-general, a check on the Bank of *Pennsylvania* for 27,838 dollars, 13 cents, including the surveyor-general's and secretary's fees, on which he was credited in the cash book of the receiver-general for the amount. But the check, when presented on the 29th of *April*, for payment, being dishonoured, the receiver-general obliterated the entry, on the blotter, of said lands, and refused to pass his receipt to *John Nicholson's* credit in the premises. That the said *John Nicholson* on the 14th day of *June* 1794, tendered at the receiver-general's office, to the then receiver-general of the land office of *Pennsylvania*, the sum of money aforesaid, on the aforesaid application, which the receiver-general refused to receive, with which the said *John Nicholson* was dissatisfied, and applied to the attorney general respecting the same; that no money was ever paid by the said *John Nicholson* on the said application; that the said *John Nicholson* (who is now dead) on the 16th of *April* 1798, assigned and transferred the said applications, to the said *Joseph Boone*, who now applies for the said warrants, and offers to pay the purchase money for the same to the commonwealth.

The board taking the premises into consideration, on due advisement had, do order and decree, that the said tender by the said *John Nicholson*, of the purchase money and fees to the said then receiver-general, and his refusal to receive the same, were, as to rendering the said application good and effectual in law, equivalent to payment, being all the said applicant had in his power to do. That by the assignment and transfer of the said application to the said *Joseph Boone*, the right to prosecute and carry the same into effect, became vested in him. The board, therefore, order that warrants issue to the said *Joseph Boone*, as assignee of the said *John Nicholson*, upon the said application, he paying the purchase money agreeably to law.

*January* 25th, 1805.—The petition of Messrs. *Nicklin* and *Griffith*, stating " that by a decree of the board of property, made on the 14th of *January* 1804, it was ordered that war-

1812.

GRIFFITH
*v.*
COCHRAN.

rants for two hundred and two thousand, four hundred acres, should issue to *Joseph Boone,* as assignee of *John Nicholson,* in the eighteen districts, he paying the purchase money according to law. That the right of the said *Joseph Boone,* in the said decree, has been in due form of law, transferred to the petitioners, who believe they have discovered vacant and unappropriated lands in the said districts, to the amount of thirty thousand acres, on which a like portion of said warrants may be laid, and requesting warrants to the amount of thirty thousand acres to issue to them, as assignees of the said *Joseph Boone,* in part execution or satisfaction of the said decree, upon their paying the purchase money according to law, on that portion of the said warrants decreed to the said *Joseph Boone*—was read—whereupon the board considered: That according to the opinion of the attorney-general, *John Nicholson,* upon payment on or before the 15th of *June* 1794, of the purchase money for two hundred and six warrants, applied for by him on the 21st day of *April* 1794, "became entitled to the warrants applied for; and the tender and refusal of the money on or before that day, was equal to the payment, so far as to vest the right in Mr. *Nicholson;* his assignee therefore is entitled to the warrants for the lands applied for, upon payment of the purchase money." And that the tender for the same was so made. And the board further considering that the act, intitled "an act to prevent the receiving any more applications, or issuing any more warrants, except in certain cases, for land within this commonwealth," passed the 22d day of *April* 1794, declares "that all applications for lands that remain on the files of the land office, after the said 15th of *June* (then) next, and for which the purchase money shall not have been paid on that day, shall be null and void &c.," thereby giving the space of fifty-four days from and after the passing of that act, for such payment to be made, and no more, there appears reasonable ground to doubt, whether, consistent with the spirit of that act, the board may allow unlimited time for the lands so applied for by the said *Nicholson,* at the discretion of the assignees. Therefore, ordered, that for so much of the lands, so applied for by *John Nicholson,* as shall be paid for into the hands of the receiver-general within fifty-

four days from this time, warrants to issue to the assignee or assignees of the said *John Nicholson.*" .

The substance of the minute or decision which gave immediate rise to the present controversy, is as follows:

*October* 26th, 1810.——On the 8th of *October* (instant) *Robert E. Griffith* applied to the secretary of the land office, by his attorney, for patents of confirmation to lands in *Clearfield* county, surveyed on warrants dated the 19th of *March* 1805, granted to *Philip Nicklin* and *Robert E. Griffith.* The secretary of the land office had doubts as to the propriety of granting patents, until the board has held the subject under advisement till this time, and have examined the laws and facts relating thereto; and find, that on the 21st day of *April* 1794, *John Nicholson* applied to the receiver general for 202,400 acres of land in the eighteen districts. The act of the 8th of *April* 1785, directs that "every such applicant shall set forth in words at length, and not in figures only, the number of acres asked by each applicant respectively." The same law says, that the secretary of the land office " shall receive and file all applications made to him for lands within the late purchase." The application of *John Nicholson* was made to the receiver-general, and not to the secretary of the land office; his application does not set forth in words at length the number of acres asked for. (It then proceeded to state the facts set forth in the preceding minutes, the opinions of several gentlemen of the professsion, the issuing of the warrants to the relator, the application for patents of confirmation, the arguments of the board to shew that the warrants had issued irregularly, and then concluded as follows.) Under all these circumstances, however, as the warrants have been issued, and a considerable sum of money paid, (although as the board conceive, not agreeably to law) yet being convinced that no evil, (injurious to the commonwealth) can arise by confirming the title, and that some inconvenience might arise to the warrantees by not doing it, and also believing the powers given the board by law, sufficient to warrant them in so doing:——and the board also considering, that as said *Nicholson* did not take any legal step to obtain a redress after tendering the money, within a reasonable time; and that he ought not to be bene-

1812.

GRIFFITH
v.
COCHRAN.

fited by his own wrong acts, and thereby injure the commonwealth, by holding his claim to the land, and witholding the money from the public treasury,—The board do therefore direct that patents issue to the said *Griffith* for the same, as surviving joint-tenant, he first paying into the state treasury, the balance that may be found due on each of the tracts surveyed on said warrants, *including interest on the same from the* 21st *of April* 1794, together with the price of the legal surplus land and office fees.*

*Hopkins* for the relator, and *the Attorney General (Ingersoll)* for the secretary of the land office, agreed to go into the whole merits, without regard to any exceptions to the return.

*Arguments for the relator.* There are two questions, 1. Whether the relator does not sustain an injury by the conduct of the secretary. 2. Whether he is not entitled to the remedy of *mandamus.*

1. The dispute is in relation to the interest, which the secretary would charge upon the whole land in the warrants of the relator, from the date of the applications by *John Nicholson* in 1794; and which ought not to be charged except for the surplus in the surveys, and upon that only from the date of those surveys until the 5th of *November* 1810, when that amount was tendered and refused.

The commonwealth as to this question is upon the footing of an individual; and if interest to an individual would be barred by tender and refusal, so will interest to the commonwealth. The tender by *Nicholson* on the 14th of *June* 1794, was perfectly in time by the act of 22d *April* 1794. Had payment been then made, the applications would have remained effectual, and no interest would have accrued. But payment could not be made, unless the receiver-general would accept. It was his duty to accept a payment offered at that time; and since it was his duty to accept, and all that was in the power of *Nicholson* was to tender, tender

---

* The returns made by the secretary of the land office, and the documents connected with the present question, I have abstracted from the fifth volume of Mr. *Smith's* late excellent edition of the laws of *Pennsylvania,* where they may be found at large.

and refusal to accept were equivalent to payment, as to the question of interest. Tender and refusal are equivalent to actual performance. *Blackwell* v. *Nash* (a), *Jones* v. *Barkley* (b). He who prevents a thing from being done, shall not take advantage of its not being done. *Fleming* v. *Gilbert* (c). A tender at common law suspends interest until a subsequent demand and refusal have taken place. *Johnson* v. *Hocker* (d).

1812.

GRIFFITH
v.
COCHRAN.

There is another objection to the interest. If a creditor accepts the principal without interest, he cannot afterwards recover the interest. *Tillotson* v. *Preston* (e). This rule is well settled. Here the officers of the commonwealth, by order of the board of property of the 25th of *January* 1805, accepted the principal of the purchase money, upon such of the warrants as were taken out by the relator, issued those warrants, and at a subsequent day accepted the surveys. The rule prevails *à fortiori* in the present case; because a demand of the interest would have deterred the relator from taking his warrants then, as it does from taking his patents now. He has paid the purchase money to an amount exceeding 10,000 dollars upon the faith of this rule, and the recognition of it by the board of property.

2. The question of remedy is by far the most important. Titles to an immense amount depend upon the interference of the court in cases of this kind. The will or caprice of an individual may otherwise constitute the law of the land; and the settlement of the state, as well as the property of its citizens, receive a severe and irreparable injury.

By the act of 22d *May* 1722, 1 *Smith's Laws* 139, the justices of this court have full power and authority, as often as there may be occasion, to issue all remedial and other writs and process, and to minister justice to all persons, as fully as the justices of the King's Bench, Common Pleas, and Exchequer at *Westminster*, or any of them may or can do. A more comprehensive endowment of legal power cannot be imagined. It certainly includes, and has long been practically held to include, the authority to issue writs of *mandamus*.

(a) 1 *Stra.* 535.  (c) 3 *Johns.* 531.  (e) 3 *Johns.* 229.
(b) *Doug.* 661.  (d) 1 *Dall.* 407.

1812.

GRIFFITH
v.
COCHRAN.

This writ issues in all cases where the party has a right to have any thing done, and has no other *specific* means of compelling its performance. 3 *Bl. Comm.* 110. It ought to be used, says lord *Mansfield*, upon all occasions where the law has established no specific remedy, and where in justice and good government there ought to be one. *Rex* v. *Barker* (*a*). It has been of late liberally interposed for the benefit of the subject, and the advancement of justice. It is used for the control of inferior courts, jurisdictions, and magistrates; to compel judges to seal a bill of exceptions, to grant letters of administration, and all officers to do those legal acts, which it is their duty to do. *Rex* v. *Leicester* (*b*), *Sikes* v. *Ransom* (*c*). It is peculiarly the writ to enforce obedience to acts of parliament, and in such cases is demandable *ex debito justitiæ*. 4 *Bac. Abr.* 496. 507. *Mandamus D.*, *Bull. N. P.* 199. Wherever a new jurisdiction is erected, by public or private act, it is subject to the inspection of the King's Bench, and in this commonwealth of the Supreme Court, by writ of *mandamus*. *Lawton* v. *Commissioners of Highways* (*d*).

By the act of 29th *March* 1809, 5 *Smith's Laws* 46, which abolished the office of receiver-general, it is made the duty of the secretary of the land office from time to time, as the same may be necessary, to make or cause to be made, all calculations of the purchase money and interest due on lands sold, and to direct the payment of the money into the treasury.

The question is, what is the nature of this duty? It is merely ministerial. The price of the land is fixed by law. The interest is a matter of arithmetical calculation, upon the surplus land surveyed, from the date of the survey. The secretary alone has the authority to make it; and the intervention of the board of property, to give to the calculation the colour of a judicial act, is not warranted by law, and was improper.

Has he performed the duty, and has he not refused to do it? There can be no doubt. It is a fallacy to call his act, a calculation of the interest due. He might as well have named

(*a*) 3 *Burr.* 1267.                    (*c*) 6 *Johns.* 279.
(*b*) 4 *Burr.* 2088.                    (*d*) 2 *Caines* 182.

a round sum. It is not a calculation, but the assertion of a false principle. He has refused to make the calculation. Suppose he has a discretion and judgment to exercise, this is nothing, for discretion and judgment are essential to every official act. He has no deliberative or judicial power; and the knowledge of this has induced him to bring in the board of property. Although this court may not possess the right of commanding that board how to decide, yet precisely as the King's Bench may issue a *mandamus* to the ordinary to grant administration to one who is next of kin, so may this court enforce obedience to its judgment upon the true principle of calculation, by *mandamus* to the secretary.

The commonwealth is surely no party in any sense within the constitution. The commonwealth has already ordered the secretary to perform this duty. He is refractory, and will not perform it. It is the commonwealth, through its court, that would compel him to perform it.

The relator has no other remedy, certainly no other specific remedy. His title must remain incomplete for want of a patent; and while the controversy is suspended, he loses the use of his property, and the state an increase of her settlement, and population.

*Arguments for the defendant.*

1. On the merits, the relator is not entitled. The principle of tender and refusal does not apply to a case like this, in which *Nicholson*, from the 14th of *June* 1794 to the 16th of *April* 1798, manifested by no act whatever an intention to prosecute his claim, and then only manifested it by assigning it as something of value, to one who also slept over it until the 14th of *January* 1804. The relator was silent in like manner until *January* 1805. What were the commonwealth officers to do? How could they compel payment of the money? What authority had they to demand it, and according to the principle of the common law to set the interest in motion again? They could not, and therefore the rule by which interest ceases, does not apply.

2. He is clearly not intitled to the remedy. In the first place, he does not want it, because he has another, if his principle is sound. He has a warrant, and survey accepted, and purchase money paid. It is indeed only an equitable

1812.

GRIFFITH
v.
COCHRAN.

title; but he may maintain an ejectment upon it to obtain possession; and he may defend possession against the commonwealth, and litigate the question of interest, in an ordinary suit at law. That he cannot obtain a patent by such a proceeding is true; but many are the cases in which the legal title, in spite of all this court can do, must continue distinct from the equitable ownership. *In the case of articles of agreement to convey, or of an expired trust, the legal owner may if he chuses, refuse a conveyance.* But the *cestuy que use*, as to every question of remedy, and of substantial property, is, in this state, as well without it as with it; and when the rule of the *English* law is transferred to this commonwealth, that a *mandamus* will lie, where there is no other specific remedy, this court must understand the term *remedy* in reference to its own laws. The relator has a specific remedy by ejectment, because without patent, he may obtain or defend possession. In *Rex* v. *Blooer* (a) it issued to restore a curate to a chapel, endowed with lands, solely because he could not maintain ejectment. It was granted to supervisors, in the *Commonwealth* v. *Johnson* (b), because there was no other remedy.

In the second place, a *mandamus* will not lie, under the circumstances of this case.

The authority of the court to issue writs of *mandamus* is not questioned; but it never goes to a person acting in a judicial or deliberative capacity, to tell him how to decide. It goes to compel the visitor of a corporation to exercise his visitorial power, but not to point out the *manner*, in which he shall exercise it. *Philips* v. *Bury* (c). Though it may be granted to an inferior court to decide, yet it cannot compel a particular decision. *Commonwealth* v. *Judges &c.* (d). Its use is to enforce obedience of courts, jurisdictions, and officers, who either will not exercise their judicial or deliberative power at all, or have no such power to exercise, but decline doing a ministerial act: as to enter up judgment, 3 *Bla. Comm.* 110, 111; to compel the meeting of a corporation, *Green* v. *Mayor of Durham* (e). But it is never used to control the deliberations of inferior officers or courts;

(a) 2 *Burr.* 1043.        (c) 1 *Ld. Ray.* 5.        (e) 1 *Burr.* 131.
(b) 2 *Binn.* 279.         (d) 3 *Binn.* 273.

and it has been the disposition of this court, to prevent its multiplication, because it is not a convenient mode of trying questions of title. *Commonwealth* v. *Rossiter* (*a*).

The power of the secretary of the land office as to the calculation, is not ministerial. The terms of the purchase, the conditions of the sale, the conduct of purchasers and surveyors, may all affect the question, and he must deliberate upon, and decide, the rule that is proper for the case. He has decided. He has made calculations, and tendered them. If a *mandamus* goes, it can only be for the purpose of telling him how to make them.

But he has called in the board of property, and with great propriety. When difficulties occur in relation to titles, it is his duty to consult that tribunal, and to follow their instructions; and so he has done in this instance. The decision of the secretary, has therefore been the decision of the board of property, a species of court, possessing judicial powers, large discretion, and in some instances great authority. By the act of 5th *April* 1782, 2 *Smith's Laws* 13, they are to hear and determine in all cases of controversy on *caveats*, in all matters of *difficulty* and irregularity, touching escheats, warrants on escheats, warrants to agree, rights of pre-emption, promises, *imperfect titles, or otherwise,* which may arise in transacting the business of the land office. They may by the act of 6th *February* 1804, 4 *Smith's Laws* 113, administer oaths to witnesses. They hear parties and counsel, they deliberate, they decide; and they have done all in this very case. This court cannot issue a *mandamus* to direct the judgment of that body. Writs of *mandamus* have issued it is true in like cases; but it has been with the acquiescence of the board of property, to obtain an opinion of this court, and for no other reason.

Finally the commonwealth is interested as a party. Her officers assert a right on her behalf to receive a large sum of money, which the relator denies. It is the very point in issue here. To grant a *mandamus,* is to compel the commonwealth to submit as a party to the decision of this court, against her consent.

(*a*) 2 *Binn.* 362.

1812.

GRIFFITH
v.
COCHRAN.

TILGHMAN C. J. Although this court has in several instances granted rules on the secretary of the land office, to shew cause why a *mandamus* should not issue, commanding him to make out patents, yet no *mandamus* has ever issued; because these rules have been made in consequence of the wish of the board of property to know the opinion of the court, and to comply with it. In the case of the *Commonwealth* v. *Tench Coxe, secretary of the land office,* the propriety of this remedy was brought into question, but not decided on, as the *mandamus* was denied on the merits of the case. The power of the court to issue writs of *mandamus* is confessed; it is grounded on an old act of assembly (22d *May* 1722), by which we have all the powers of the Courts of King's Bench, Common Pleas, and Exchequer in *England.* But it is contended that this is not a case in which that power can be properly exercised. It becomes necessary therefore, to consider the nature of the case. Without entering unnecessarily into its merits, it appears that on the 21st of *April* 1794, *John Nicholson* deceased, under whom Mr. *Griffith* claims, entered applications for two hundred and six warrants, containing 202,400 acres of land, for which he gave his check on the Bank of *Pennsylvania,* for 27,838 dollars 13 cents, to the receiver-general. On the 29th of *April* the check was presented, and payment refused by the bank. On the 14th of *June* of the same year, *Nicholson* tendered the amount of the check to the receiver-general who refused to receive it, having obliterated the credit entered to *Nicholson* in his books, at the time the check was given. The right of *Nicholson* under those applications, has after several assignments, become vested in Mr. *Griffith.* In 1805 the board of property made, an order that warrants for 80,400 acres, should issue on payment of the *purchase money according to law.* The warrants were accordingly issued, the usual purchase money paid, and surveys have since been returned, containing the quantity called for by the warrants, and a considerable surplus. Mr. *Griffith,* wishing to obtain patents on these surveys, applied to the secretary of the land office, to make calculations ascertaining the sum to be paid to the treasurer. A considerable difference of opinion prevails between the secretary and the agent of Mr. *Griffith* with respect to the balance due to the commonwealth, the secretary contending that interest should be paid from *April* 1794,

when the applications of *John Nicholson* were entered. The matter of interest I understand to have been the sole point of controversy, Mr. *Griffith* having been always ready to pay the balance of the principal, and all fees of office. The cause shewn against the *mandamus* is, that the secretary has always been ready to make the calculations, according to the principles laid down by the board of property to whom the case was submitted, and that in fact the calculations were made and offered to the agent of Mr. *Griffith*, who refused to receive them.

The principles which govern the court, in issuing writs of *mandamus*, are well understood, and the counsel who argued this cause have not differed in that respect. Where a ministerial act is to be done, and there is no other specific remedy, a *mandamus* will be granted to do the act which is required. But where the complaint is against a person who acts in a judicial or deliberative capacity, he may be ordered by *mandamus* to proceed to do his duty, by deciding and acting according to the best of his judgment, but the court will not direct him in what manner to decide. This was the principle adopted by the Supreme Court of the *United States* in the case of the *United States* v. *Lawrence*, and it has been frequently recognised by this court, particularly in the case of *the Commonwealth* v. *the Judges of the Court of Common Pleas of Philadelphia county.* 3 *Binn.* 272.

But it is said, that the act required of the secretary is purely ministerial, and enjoined on him by the third section of the act of the 29th *March* 1809. By this act, the office of receiver general is abolished, and it is directed that the secretary of the land office, " shall make all calculations of " purchase money and interest on lands sold or that shall be " sold by the state, and direct the payment of the money by " the applicant, with the price of the warrants, into the state " treasury." These calculations were formerly made by the receiver-general, who, as well as the secretary of the land office, was a member of the board of property. As the objection to the *mandamus* rests in a great measure on the order of this board, it will be proper to consider its nature and its powers. The late proprietaries established a board of property for superintending the business of the land office, which consisted of the principal proprietary officers, that is to say,

the governor for the time being, the secretary of the land office, the surveyor-general, the receiver-general and the auditor. This board was applied to, and decided in all matters of difficulty, and although not recognised as a judicial tribunal, yet the business brought before it was very important, and such as required great deliberation. We shall find however, that after the commonwealth took the affairs of the proprietaries into their own hands, they thought proper to clothe the board of property with judicial authority. By the act of the 5th of *April* 1782, the board of property was established and its powers defined, that is to say, they were " to " hear and determine in all cases of controversy on caveats, " in all matters of difficulty or irregularity, touching escheats, " warrants on escheats, warrants to agree, rights of pre- " emption, promises, imperfect titles, *or otherwise*, which " heretofore have or hereafter may arise in transacting the " business of the said land office;" but it is provided that the courts of law shall be open to any party who is dissatisfied with the sentence of the board, as fully as if no sentence had been given. There are other legislative provisions, by which they have power to administer oaths in causes depending before them, and their decisions on caveats respecting lands in certain parts of the state, are conclusive, unless an ejectment is brought in six months, by the party against whom the decision is made. The constituent members of the board have been varied from time to time. It consists at present of the secretary of the commonwealth, the secretary of the land office, and the surveyor-general. According to the true intent of the act of 1782, if a difficulty arises in any particular department, it is the duty of the officer to refer the matter to the board, and such has been the conduct of the secretary of the land office on the present occasion. I do not consider the calculation of the purchase money as an act merely *ministerial;* for in order to ascertain the amount, the contract must be examined. The price of land has been different at different times, and in different parts of the state; and sometimes conditions have been annexed to the purchase, besides the payment of money. I can conceive many difficulties which may arise from these circumstances. Besides, the secretary of the land office may have reason to think, that there has been something wrong in the conduct

of the applicants for land, or of the deputy surveyor or other officers, and in such case it would be his duty to stop the calculations till the matter is decided by the board. If the secretary had in this case refused to make any calculation, or take any step whereby the business of the applicant might be dispatched, it would certainly have been our duty to compel him by *mandamus;* but having taken measures for the decision by the proper authority, of a matter in which he conceives there is difficulty, and having offered to act according to the decision of that authority, he has shown sufficient cause against a *mandamus*, unless there is some other principle by which we are called upon to interpose. It has been said that there is such a principle, and that our interposition is necessary to prevent a defect of justice. If by a defect of justice, it is meant, that no action lies against the commonwealth, it is clear that this would be no ground for a *mandamus*. For if the commonwealth by our constitution is not subject to an action, but with its own consent, then we have no right to do that *indirectly* by *mandamus*, which we have no power to do *directly;* and we might as well be called on to issue a *mandamus* to the state treasurer, to pay every debt which is claimed by an individual from the state. But although no suit can be brought directly against the state, yet the case of Mr. *Griffith* is not entirely without remedy; for having tendered the money to which the state is justly entitled, he may enter on the lands and hold them, or in case the state grant them to other persons who take possession, he may support an ejectment against such persons. His situation, indeed, as to obtaining a complete title by patent, is not much different from what it would be, if his contest was with an individual; for we have no court of chancery to compel a specific performance of a contract for the purchase of land. When the party entitled to a conveyance, does every thing necessary to be done, in order to obtain a decree for a specific performance, he stands with us in a situation to support or defend an action for the possession of the land. But even if there was a total defect of justice, I do not conceive that that consideration would authorise a *mandamus* against a member of the board of property, acting under the direction of the board, in a matter on which they had a right to decide. Such a defect would

1812.

GRIFFITH
v.
COCHRAN.

deserve the serious attention of the legislature; but they alone would be competent to provide a remedy. I have considered this case very attentively, because I am sensible that the state may suffer great injury from the suspense in which titles to large quantities of land is held. Uncertainty of title prevents the improvement of the country. But, on which ever side I view it, I find insuperable objections to a *mandamus.* My opinion is, that the secretary of the land office has shewn sufficient cause, and therefore this court should abstain from any farther proceeding.

YEATES J. The present case comes before us, on a rule to show cause why a *mandamus* should not issue, commanding the secretary to prepare and deliver to *Robert E. Griffith,* the usual calculations &c., preparatory to patenting certain lands. Return has been made thereto, that those calculations had been made agreeably to the decision of the board of property, on the 26th of *October* 1810, computing the interest on the whole purchase money from the 21st of *April* 1794, when the lands were applied for by *John Nicholson.*

The relator, *Robert E. Griffith,* who is the surviving assignee of the warrants, has objected thereto, inasmuch as a former board of property before whom the matter was brought, have in their minutes made on the 14th of *January* 1804, recognised a tender of the large sum of 27,838 dollars 13 cents, in full of the purchase money of 206 warrants applied for by the said *John Nicholson,* as made on the 14th of *June* 1794; and that he and his assignees are exempted by reason thereof, from the payment of interest in the intermediate time. The secretary in his return, has relied on his conformity to the decision of the board, in *October* 1810, whose directions in the case of an imperfect title to lands to be completed in the land office, he was bound to pursue. And it is now insisted by the attorney general, that this being a case wherein the fiscal concerns of the commonwealth are to be affected, the secretary of the land office, independently of the merits, ought not to be compelled to answer in this court, without a special law enacted for the purpose.

Under these facts, the question is, whether a writ of *mandamus* ought to be awarded? The case has been minutely stated by the Chief Justice.

It is a high prerogative writ, which issues in all cases where the party has a right to have any thing done, and has no other specific means of compelling its performance. But such writs are not so convenient for the trial of title, as the usual common law actions, and are not to be unnecessarily multiplied. 2 *Binney* 262. Though a *mandamus* will lie to an inferior jurisdiction to compel that tribunal to proceed to judgment, it will never issue to prescribe what judgment shall be given. 3 *Dall.* 53., 3 *Binney* 275. It would be a waste of time to cite further authorities upon the point. But I cannot avoid mentioning, that shortly after I came on the bench, the court refused in *July* term 1791, to award a *mandamus* against *Matthew Clarkson* and others, commissioners of bankrupt, directing them to grant a certificate of conformity to one *Freeport*, who had been examined before them, though the court differed with the commissioners as to his answers.

It is alleged here, that Mr. *Griffith* may enter on these lands if vacant, and defend himself at law, if attacked; and if any other person enters adversely to his title, he may prosecute his writ of ejectment against him, and try his right. It is true that he cannot by these means obtain his patents, whereby he may convey a complete legal title to purchasers; but he has the same remedies, and stands in the same situation, as any other person who claims lands under articles of agreement, if from the circumstances of his case he would be entitled to specific execution, in a court of equity. ·

By an act of assembly passed the 5th of *April* 1782, a board of property was constituted, with power " to hear and deter-" mine in all cases of controversy on *caveats*, in all matters " of difficulty or irregularity touching escheats, warrants on " escheats, warrants to agree, rights of preemption, pro-" mises, imperfect titles, or otherwise, which heretofore " have, or hereafter may arise, in transacting the business " of the land office."

Other organizations of the board, have been made by two other laws, passed the 8th of *January* 1791, and the 29th of *March* 1809; but their powers continue as granted under the first law.

It is contended on the part of the relator, that the secretary of the land office is merely a ministerial officer, in making

1812.

GRIFFITH
v.
COCHRAN.

these calculations, and that the law must be his guide in that particular. Judicial knowledge certainly is not required in the performance of arithmetical operations: but whoever will carefully examine the act of the 8th of *April* 1785, (2 *Dall. St. Laws* 30,) which is one of the laws under which these warrants issued, will find it to be one of the most unintelligible contradictory acts, which appear in our statute books. This I well know, that in the discussion of a motion for a new trial, between the *Lessee of Willinck and others*, and *Morris and Nicholson*, in *December* term 1800, the members of this court, after full argument by learned counsel, expressed very different opinions of the true construction of it.

It appears to me, that if any difficulty occurred to the secretary in the investigation of the relator's title to these lands, or as to the principles upon which the calculation of the purchase money should proceed, he was justifiable in convening the board of property, and requiring their directions in the premises, to which he was afterward bound to conform; and that though this court should entertain an opinion very different therefrom, we ought not to enforce our decision upon the secretary by a writ of *mandamus*. Mr. *Griffith* is not concluded by the decision of the board, but may contest it at law, when the legal question will come before the court between proper parties. It cannot be the wish of the legislature to hang up the title in suspense, and thereby injure the public interest; and I should presume, that the legislature upon a proper application to them, would put the matter in a train for a speedy decision.

I have cautiously avoided saying any thing on the merits of the case, which might lead to prejudice the claim of either party. At present, I am of opinion, that the *mandamus* prayed for should be denied.

BRACKENRIDGE J. having been unable to attend the argument, in consequence of ill health, gave no opinion.

Peremptory *mandamus* denied.